IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA TAYLOR, | ) | Case No. 3:20-cv-1358 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Christina Taylor, seeks judicial review of the final decision of the
Commissioner of Social Security, denying her applications for disability insurance benefits
("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security
Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule
72.2(b).  Taylor claims that the ALJ misevaluated the evidence of her depression – which led to a
finding that Taylor could perform work on a sustained and regular basis – despite Taylor's
history of being unable to get out of bed one to three days per month.  However, because the
Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision
supported by substantial evidence, I recommend that the Commissioner's final decision denying
Taylor's applications for DIB and SSI be affirmed.

## I.     Procedural History

On April 17, 2017, Taylor applied for DIB and SSI.  (Tr. 234-41).[1]  Taylor alleged that she became disabled on October 1, 2004, due to: "1. Bipolar Disorder; 2. Opioid and Cocaine Use Disorder; 3. [Bulging] disc; 4. [Protruding] disc; 5. Fractured both hips; 6. Bursitis/Arthritis; 7. Fused right hip; 8. Fractured top of right foot and right heel; 9. Hepatitis C; [and] 10. Depression Disorder."  (Tr. 234, 236, 305).[2]  The Social Security Administration denied Taylor's applications initially and upon reconsideration.  (Tr. 88-121, 124-57).  Taylor requested an administrative hearing.  (Tr. 190-91).  She then amended her alleged onset date to April 17, 2017.  (Tr. 262).  ALJ Richard Horowitz heard Taylor's case on February 15, 2019 and denied the claim in an April 15, 2019 decision.  (Tr. 10-26, 40-87).  On April 24, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On June 22, 2020, Taylor filed a complaint to obtain judicial review. ECF Doc. 1.

## II.    Evidence

### A.     Personal, Educational, and Vocational Evidence

Taylor was born on August 14, 1984 and was 20 years old at the alleged onset date. (Tr. 88, 234).  Her date last insured was December 31, 2018, at which time she was 33 years old.

---

[1] The administrative transcript appears in ECF Doc. 12.
Taylor's DIB application indicates that it was filed on "April 18, 2017," and her SSI application does not specify a date of filing.  (Tr. 234, 236).  The Social Security Administration and the ALJ treated the applications as filed on "April 17, 2017."  (Tr. 10, 55, 105, 124, 141).  In her brief to this court, Taylor says it was filed "approximately 4/18/2017."  ECF Doc. 14.  For the sake of consistency and because the one-day difference is immaterial, I will consider April 17, 2017 the date of filing for purposes of my recommendation.

[2] Taylor's applications alleged two different onset dates: October 1, 2004 for her DIB application; and January 1, 2010 for her SSI application.  (Tr. 234, 236).  The Social Security Administration and the ALJ, however, considered only October 1, 2004 as the onset date alleged in her applications.  (Tr. 10, 89, 106, 125, 142).  For the sake of consistency and because the onset date alleged in her applications is immaterial, given her later amendment, I will treat October 1, 2004 as the onset date alleged in both her DIB and SSI applications.

(Tr. 13, 234).  Taylor graduated from high school and completed two years of college in 2012, and she had vocational training in welding, medical assisting, medical coding, medical terminology, CPR training, and "STNA.".  (Tr. 306).  She had past work as a call center operator, boring machine operator, heat press operator, welder, security guard, and nurse's aide, but the ALJ determined that she could not perform her past relevant work.  (Tr. 23-24, 51-57, 275-81, 283-86, 293, 307).

On May 30, 2017, Taylor prepared a form "Function Report."  (Tr. 324-33).  Taylor stated therein that she lived alone in an apartment.  (Tr. 326).  He bipolar disorder kept her from being able to hold a job or maintain a schedule.  (*Id.*).  Her daily activities consisted of going to treatment groups, meetings, individual counseling, doctors' appointments, and spending time with her children.  (Tr. 327).  She could handle her personal care, daily meal preparation, and indoor household chores without impairment from her conditions.  (Tr. 327- 28).  And she did not need to be encouraged to do chores.  (Tr. 328).

Taylor further stated that she went outside daily, could do so alone, and could get around by walking, driving a car, or riding in a car.  (Tr. 329).  She went shopping for groceries weekly and could pay bills, count change, handle a savings account, and use a checkbook/money orders.  (*Id.*).  She claimed that her ability to handle money had been impaired by her conditions, in that she no longer made any money.  (Tr. 330).  Her hobbies consisted of reading and watching television, which she did daily.  (*Id.*).  Taylor would also go out to eat, shop, and hang out weekly with other people.  (*Id.*).  She had no problems getting along with family, friends, neighbors, or others.  (Tr. 331).  She attended drug treatment daily and needed to be reminded to go places but did not need to be accompanied.  (Tr. 330).

Taylor indicated that her conditions affected, as relevant here, her memory, concentration, and ability to complete tasks.  (Tr. 331).  Her attention span varied by day and she marked both "Yes" and "No" on the question, "Do you finish what you start?"  (*Id.*).  She had no issues following instructions or getting along with authority figures.  (Tr. 331-32).  Taylor also handled stress and changes in routine "pretty well."  (Tr. 332).

### B.    Relevant Medical Evidence

Taylor focuses her challenge upon the ALJ's consideration of the evidence and subjective symptom complaints regarding her mental health impairments at Step Four of the sequential evaluation; thus, I will summarize only the medical and opinion evidence related to her mental health impairments.  *See generally* ECF Doc. 14.

Between June 2008 and November 2016, Taylor received mental health treatment from several providers for anxiety, depression, bipolar disorder, and substance abuse.  *See* (Tr. 473, 480, 506-07, 514-16, 541-42, 834-36, 863-69, 1044-65, 1071-73, 1077-94, 1102-04, 1206-16, 1224-25, 1228-35, 1255-64, 1267-69, 1272-73, 1284-89, 1294-1300, 1332-36, 1379-81, 1448-50, 1590-92, 2128-38).

In November 2016, Taylor reached out to Harbor Behavioral Healthcare for treatment.  (Tr. 1615, 1668).  On March 9, 2017, Taylor indicated that she had just been released from jail and rehabilitation for drug related charges.  (Tr. 1663).  She had used several opiates since age 25, including heroin, suboxone, and cocaine but had not used any drugs in the past several months.  (Tr. 1663-64).

On April 10, 2017, Taylor began psychiatric treatment with David Zick, MD.  (Tr. 1652).  She had recently restarted medication treatment with Lamictal and Prozac, as well as vivitrol.  (Tr. 1653).  And Taylor wanted to continue her medication.  (*Id.*).  Her week consisted of one

one-hour individual meeting, two group meetings, and three outside meetings, while seeing her

primary care physician and caring for her seven- and five-year-old kids.  (Tr. 1653).  Taylor gave

inconsistent statements regarding her desire to work, stating that she wanted time to stabilize

before returning to work, while also stating that she would be applying for disability and likely

would not work more than part-time.  (*Id.*).  She added, "I have never been able to hold a job for

more than a year."  (*Id.*). Dr. Zick noted that she had been consistent in keeping her

appointments with Harbor, where she also received treatment from Christine Ellis, MD, for

primary care.  (Tr. 1652-53).  He diagnosed Taylor with bipolar disorder, not otherwise

specified; opioid use disorder and dependence in early partial remission; and alcohol dependence

in sustained full remission.  (Tr. 1654).  He increased her Lamictal dosage and continued her

medication.  (*Id.*).

        Taylor missed her May 24, 2017 appointment with Dr. Zick but remained active with the

medication assisted therapy clinic.  (Tr. 1618).  She returned to Dr. Zick on July 3, 2017,

reporting that "[s]has been doing well."  (Tr. 1617).  Her mood was good, she developed a

relationship with her family, and she had been going to alcohol and substance use group

meetings.  (*Id.*).  However, Taylor also stated – with incongruent affect – that she had been

depressed, without motivation, and in bed for up to three days.  (Tr. 1618).  She continued, "I

don't work, I don't leave my house, [and I] sit around the house all day."  (*Id.*).  She also told the

nurse, "I just don't want to do anything."  (Tr. 1629).  Dr. Zick noted, however, that she

enthusiastically stated she was going to see fireworks that night and was pretty well tanned.

(Tr. 1618).  Upon examination, Taylor was alert and oriented and had: (1) good grooming and

hygiene; (2) cooperative and pleasant demeanor; (3) euthymic mood; (4) broad affect; (5) logical

thought process; (6) intact memory; (7) average intelligence; and (8) fair insight and judgment. (Tr. 1619).  Dr. Zick reiterated Taylor's diagnoses and adjusted her medication.  (Tr. 1618-19).

On July 21, 2017, Taylor visited Nicholas Sidle, QMHS, LCDC III, for individual counseling.  (Tr. 1752-54).  Taylor reported, "I feel great right now.  I haven't felt this good in a long time.  I've got all my requirements done, and I got stuff taken care of at home."  (Tr. 1753). She also had been hired to weld someone a derby car.  (*Id.*).  On August 1, 2017, reported to Sidle that she had "been good."  (Tr. 1749-50).  They also discussed that her medication helped her be more stable and consistent.  (Tr. 1750).

On October 3, 2017, Taylor visited Harbor Behavioral ahead of her appointment with Dr. Zick for medication and was seen by Sheena Munson, CNP.  (Tr. 1845-51).  Taylor reported that her mood was stable on Lamictal and Prozac and denied depressive, manic, or anxious symptoms.  (Tr. 1845).  She had completed her substance use treatment and was now on unsupervised probation.  (*Id.*).  Upon examination, Taylor was alert and oriented and cooperative and pleasant.  (Tr. 1847).  Munson noted that she had good grooming, euthymic mood, broad affect, logical thought processes, intact memory, average intelligence, and fair insight and judgment.  (Tr. 1847-48).

On October 12, 2017, Taylor presented to Dr. Zick for medication management, though she arrived 15 minutes late to the appointment.  (Tr. 1852-53).  Taylor continued to do "Ok overall."  (Tr. 1853).  She was "well animated, pleasant, sociable, and conversational."  (*Id.*). Taylor indicated that she spent most of her time with her kids and supervising them on the weekends.  (*Id.*).  Her evenings consisted of kids' sports, because her children played hockey, and had games on weekends.  (*Id.*).  Taylor further stated, "where I am at right now has been pretty good," although she did have "down times."  (Tr. 1857).  She stated that her biggest issue

with working was that she would have one bad day and then not get out of bed.  (*Id.*).  Taylor's examination results were identical to those on October 3, 2017.  (Tr. 1855-56).  And Dr. Zick continued medication.  (Tr. 1857).

On November 10, 2017, Taylor visited Zepf Center to request substance abuse treatment. (Tr. 2236).  She reported living alone and that her mother had adopted her children, but she saw them pretty much daily.  (Tr. 2237).  She had good friendships and spent most of her time with her kids and their hockey interests.  (*Id.*).  Taylor stated that she had severe mood instability, with manic episodes of drug use and promiscuity and depressive episodes of staying in bed for days, hypersomnia, feelings of worthlessness, and lack of motivation.  (Tr. 2239).  She reported depressed mood most of the day, almost daily, with marked diminished interest in any and all activities.  (Tr. 2246).  She relapsed on her drug use, having consumed buprenorphine and cocaine in the past day.  (Tr. 2240-41).

Upon examination, Taylor appeared "[g]enerally normal" and with "[u]nremarkable" mental status results.  (Tr. 2242).  Her mood was euthymic; affect full; speech clear; thought process logical; insight, judgment, cognition, and thought content were within normal limits; and intelligence was average.  (Tr. 2242-43).  The examiner noted that she appeared to be well kept, had a positive attitude, seemed euthymic, and had appropriate affect.  (Tr. 2243).  Taylor was diagnosed with opioid dependence, cocaine dependence, and mild bipolar 1 disorder. (Tr. 2246-47).  On November 14, 2017, she started treatment with suboxone.  (Tr. 2253).  Taylor continued treatment at Zepf Center through March 6, 2019, with visits every four weeks. (Tr. 2249-2325).  In that time, she underwent 15 examinations, each of which reported that: (1) she was oriented to time, place, person, and situation; (2) no agitation, anhedonia, compulsive behavior, euphoria, fear, flight of ideas, forgetfulness, grandiosity, hallucinations, hopelessness,

7

memory loss, mood swings, obsessive thoughts, paranoia, pressured speech, or increased
activity; (3) sufficient fund of knowledge and language; (4) appropriate behavior; and (5) normal
judgment, attention span and concentration, and insight.  (Tr. 2253, 2258-59, 2264, 2269, 2275,
2281, 2287, 2293, 2298, 2303, 2308, 2314, 2317, 2320, 2324).

Meanwhile, on January 18, 2018, Taylor visited Harbor Behavioral Healthcare for
medication and was seen by Janice Carrick, DO.  (Tr. 1865, 1872).  Taylor's mental status exam
results were the same as those of her October 3, 2017 and November 20, 2017 evaluations.
(Tr.1868-69).  On March 1, 2018, Taylor failed to appear to her appointment with Dr. Zick.  (Tr.
2027).

On April 9, 2018, Taylor returned to Dr. Zick.  (*Id.*).  Dr. Zick noted that her treatment
had been considerably fragmented, with several different prescribers, and she lacked continuity
with her medication assisted therapy.  (*Id.*).  Taylor reported that, after her last visit with Dr Zick,
she started using drugs again and began treatment with Zepf Center before it "got out of control."
(*Id.*).  She had group therapy three times per week for six weeks, then therapy once a week for
three weeks, and was now attending individual sessions every other week with two outside
meetings.  (*Id.*).

Taylor reported "everything has bene [*sic*] good."  (*Id.*).  She spent most of her time at
home with her kids, read a lot, and had gotten a dog.  (*Id.*).  Dr. Zick noted that she had bright
affect.  (*Id.*).  However, Taylor indicated that her mood was "alright," and she had little
motivation.  (*Id.*).  She explained, "I don't really want to do … anything and getting out of the
house is difficult."  (*Id.*).  Taylor stated that she had little energy and her mood was low.
(Tr. 2033).  Upon examination, Dr. Zick stated that Taylor appeared alert and oriented; was
cooperative and present; and had good grooming and hygiene, logical thought process, broad

affect, intact memory, average intelligence, and fair judgment and insight.  (Tr. 2031-32).
Dr. Zick repeated her bipolar, opioid use, and alcohol dependence diagnoses and continued
medication.  (Tr. 2033-34).

On June 5, 2018, Taylor returned to Harbor for medication and was seen by Heidilyn
Drake, RN.  (Tr. 2038, 2042).  Drake noted that Taylor was alert and oriented and had
appropriate and relaxed appearance.  (Tr. 2039).  Taylor reported good mood and that her
motivation had "been alright."  (*Id.*).  She had recently moved into a new house.  (*Id.*).  However,
she reported a relapse of cocaine and heroin use likely due to a recent breakup.  (*Id.*).  Upon
examination, Taylor had clean and appropriate appearance, pleasant behavior, euthymic mood,
normal thought content, logical thought process, average intellect, congruent affect, intact
memory, and fair judgment/insight.  (Tr. 2039-40, 2049-50).

On June 25, 2018, Taylor visited Dr. Zick, stating that she had been "pretty good" over
the previous few months and was 31 days sober.  (Tr. 2070).  She had been spending more time
outside helping her friends.  (*Id.*).  Dr. Zick noted that her diagnoses were stable.  (Tr. 2070-71).
Her examination results were the same as those on June 5, 2018, and Dr. Zick continued
medication.  (Tr. 2073-74).

On September 12, 2018, Taylor returned to Harbor and was seen by Jasmine Richards,
CNP.  (Tr. 2096, 2103).  She stated that her medication was fine, her meetings were good, she
could not remember the last time she used drugs, and she attended AA meetings twice per week.
(Tr. 2096).  Her energy level was "alright" and her mood "good."  (*Id.*).  Her examination results
were the same as those from her June 5, 2018 and June 25, 2018 visits.  (Tr. 2099-2100).
Richards's impression was that Taylor appeared "fairly stable."  (Tr. 2101).

Taylor did not return to Dr. Zick until October 17, 2018, having failed to appear in August 2018. (Tr. 2104). Dr. Zick observed that Taylor was "[w]ell animated and conversational." (*Id.*) Taylor indicated that her summer had gone well and that she was a "Hockey Parent," stating that her kids had hockey six days per week, and she kept the schedule. (*Id.*). Dr. Zick noted no vegetative symptoms, and Taylor reported, "everything has been really good actually … [no] bad depression." (*Id.*). Upon examination, Dr. Zick stated that she appeared alert and oriented and had good grooming and hygiene; cooperative/pleasant demeanor; euthymic mood; broad affect; logical thought process; intact memory; average intelligence; and fair insight/judgment. (Tr. 2107-08). Dr. Zick's impression was that Taylor was "stable overall." (Tr. 2104-05, 2109).

On January 30, 2019, Taylor visited Dr. Zick, reporting that she was "stable and doing well. No major mood swings." (Tr. 2213). Upon examination, Dr. Zick noted the same results as Taylor's October 17, 2018 examination. (Tr. 2216-17).

C.      **Relevant Opinion Evidence**

On October 5, 2017, Courtney Zeune, PsyD, evaluated Taylor's mental capacity based on a review of the medical record. (Tr. 113-14, 117-19). Dr. Zeune found sustained concentration and persistence limitations. (Tr. 117). Specifically: (1) no limitations in Taylor's ability to carry out very short and simple instructions or make simple work-related decisions; (2) no significant limitation in Taylor's ability to carry out detailed instructions, maintain attention and concentration, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and sustain an ordinary routine; and (3) moderate limitations in her ability to work in coordination with or in proximity to others without being distracted and

10

completing a normal workday without unreasonable interruption and perform at a consistent pace without unreasonable rest periods.  (Tr. 117-18).

Dr. Zeune further found social interaction limitations.  (Tr. 118).  Specifically: (1) no significant limitation in Taylor's ability to ask simple questions or request assistance or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (2) moderate limitations in her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism, and getting along with others without distracting them.  (*Id.*).

Last, Dr. Zeune found adaptation limitations.  (*Id.*).  Specifically: (1) no evidence of limitation in Taylor's ability to be aware of normal hazards and take appropriate precautions or travel; (2) no significant limitation in her ability to set realistic goals; and (3) moderate limitation in her ability to respond appropriately to changes in the work setting.  (Tr. 118-19).  On February 5, 2018, Lisa Foulk, PsyD, concurred with Dr. Zeune's assessment.  (Tr. 131-32, 136-37).

### D.    Relevant Testimonial Evidence

Taylor testified at the February 15, 2019 ALJ hearing.  (Tr. 48-79).  She lived alone, could drive, and drove daily to the grocery or to visit her children.  (Tr. 49).  The last job she held was as a welder in 2017, which lasted for four months.  (Tr. 51).  She quit the job because they wanted her to take a drug test, and she knew the result would have been positive.  (Tr. 52). Taylor didn't look for work after that because of her addiction and absenteeism, which she attributed to her mental and physical impairments.  (*Id.*).  Although not the reason why she stopped welding, she had been written up for missing work.  (Tr. 52-53).

Taylor continued that – as of April 2017 – she could not work because of pain and her bipolar disorder.  (Tr. 59-60).  Because of her depression, she sometimes could not get out of

11

bed, which would cause her to miss a lot of work.  (Tr. 60).  She could not say for sure why she

missed or cancelled doctors' appointments.  (Tr. 61-62).  It might have been due to pain and she

thought that she had called in to state her reasons for missing appointments.  (Tr. 62-63).  She

then testified that she had forgotten about her appointments.  (Tr. 63, 66-67).

Taylor testified that, despite the seeming improvement in her condition through July

2018, she still had pain and depression.  (Tr. 71).  She could take care of herself, her home, and

her personal needs, but only when she was able.  (Tr. 72).  Some days, she could barely get up to

let the dog out.  (*Id.*).  And doing well for her meant only a few days in a month when she was

depressed or with pain.  (Tr. 72-74).

Taylor testified that she was depressed for one to three days a month, during which she

did not eat, shower, talk to anyone, use a phone, or "do" anything.  (Tr. 75).  She reported to her

providers she was doing "good" because one to three days per month was "good" to her.

(Tr. 75-76).  Her depression could be triggered by stress or life events.  (Tr. 76).  She had

experienced depression episodes when she used to work.  (Tr. 77).  For example, she would call

off work and was ultimately fired in 2014 for missing too many days.  (Tr. 53, 77).

A vocational expert also testified, stating that a person who missed more than one day of

work a month could not sustain entry-level unskilled work.  (Tr. 79, 86).

## III.    The ALJ's Decision

On April 15, 2019, the ALJ issued a written decision denying Taylor's claim.

(Tr. 10-26).  The ALJ made the following paraphrased findings relevant to Taylor's arguments in

this case:

> 5.  Taylor had the residual functional capacity ("RFC") to perform light work
> except: occasionally climb ramps and stairs; never climb ladders, ropes, or
> scaffolds; occasionally balance stoop, kneel, crouch, or crawl; never work around
> hazards, such as unprotected heights or moving mechanical parts; never operate a

commercial motor vehicle; and occasionally work in environments with concentrated vibrations and concentrated exposure to dust, odors, fumes, and other pulmonary irritants. Taylor was further limited to simple, routine, and repetitive tasks, but not at a production rate; simple work-related decisions; occasional interaction with supervisors and coworkers but no team or tandem work; no interaction with the general public; and few changes in the work setting, with necessary changes occurring infrequently and being adequately and easily explained. (Tr. 16).

After summarizing Taylor's mental health treatment record through January 2019, the ALJ found that Taylor's statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent with the objective evidence. "As for her mental disorders, [Taylor] alleged severe depression and mood swings that caused her to stay in bed and self-isolate up to three days a month. However, [Taylor's] treatment notes show that her mood was generally euthymic. She was consistently noted to be alert, oriented, and cooperative. She managed her symptoms well on medication, even during periods when she was not fully compliant with her treatment regimen." (Tr. 19-22).

"[Taylor's] daily activities are consistent with the restricted range of light residual functional capacity. [She] is able to live alone and manage her personal care. She can prepare meals and do household chores. She goes grocery shopping. She can pay bills, count change, handle a savings account, and use a checkbook. She looks after two dogs. She drives each day. She sees her two young children daily and supervises them at her apartment on the weekends. She goes to hockey practice or hockey games several times a week. She is able to go out to eat and spend time with others. She has no trouble getting along with others, including authority figures. She is able to manage stress and changes in routine. (see Exs. 7E [(Tr. 322-33)], 28F [(Tr. 2017-2115)]; Hearing Testimony)." (Tr. 22).

As for the opinion evidence, the opinions of the state agency psychological consultants were "less persuasive" because it was reasonable to limit Taylor to only simple, routine, and repetitive tasks and simple work-related decisions in a static work setting. The ALJ further found that Taylor should not interact with the general public or be required to do team or tandem work with coworkers given her mood swings, periodic self-isolation, and history of substance abuse. Taylor is able to occasionally interact with coworkers and supervisors given the evidence that she spent time with her kids, went to hockey games, cooperated with treatment providers, and went grocery shopping. (Tr. 23).

The ALJ summarized that his RFC was supported by the opinion, medical, and testimony evidence. (*Id.*).

6. Taylor was unable to perform any of her past relevant work. (Tr. 23-24).

10.  Considering Taylor's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform, such as mail sorter, inspector/hand packager, and laundry worker.  (Tr. 24-25).

Based on these findings, the ALJ determined that Taylor was not disabled and denied her claim. (Tr. 25-26).

## IV.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

14

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 538120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 WL 2929562 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the

15

national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

**B.      Step Four – Subjective Symptom Evaluation and Overall RFC**

Taylor argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in his evaluation of Taylor's subjective symptom complaints regarding her depression symptoms and by finding that she could perform work on a sustained and regular basis.  ECF Doc. 14 at 9-12.  She argues that ALJ failed to apply proper legal standards by not clearly evaluating how her activities of daily living equated to an ability to perform work on a sustained basis.  ECF Doc. 14 at 10.  Taylor asserts that Dr. Zick's treatment records showed an inability to sustain a work schedule, documenting her lack of motivation, need to lay in bed for one to three days per month, and her missed appointments.  *Id.*  Dr. Zick's treatment notes and her testimony, Taylor argues, consistently reflect that she would be absent at least one day per month on a regular basis, which the VE testified would be work preclusive.  ECF Doc. 14 at 11.  She contends that the ALJ's reliance on her activities of daily living was insufficient to establish that she could work on a sustained and regular basis.  *Id.*

The Commissioner responds that substantial evidence supports the ALJ's RFC finding and evaluation of Taylor's subjective symptom complaints.  ECF Doc. 16 at 5-10.  The Commissioner argues that no physician opined that she would be absent from work and that the ALJ considered the evidence Taylor pointed to in support of her position.  ECF Doc. 16 at 6.  The Commissioner notes that the ALJ's unchallenged evaluation of the opinion evidence also supported his RFC finding.  ECF Doc. 16 at 7.

16

### 1.    Step Four Standard

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 FR 34474-01 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 61 FR 34474-01, at *34477.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 61 FR 34474-01, at *34477.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence.  *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2017 WL 5180304, at *6 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").  In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and

restrictions.  SSR 16-3p, 2017 WL 5180304, at *4-8; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

If an ALJ discounts or rejects a claimant's subjective complaints, he must clearly state his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  The ALJ need not explicitly discuss each of the regulatory factors.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)).  Although the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

## 2.    Analysis

The ALJ applied proper legal standards in his evaluation of Taylor's subjective symptom complaints and in determining her RFC.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by (1) determining Taylor's RFC in light of the medical evidence, her own testimony and function report, and other evidence in the record; and (2) clearly explaining that he rejected Taylor's subjective symptom complaints because her statements regarding the intensity, persistence, and limiting effects of her depressive symptoms were not consistent with the objective evidence.  (Tr. 16-22); 20 C.F.R. §§ 404.1520(e), 416.920(e); SSR

16-3p, 2017 WL 5180304, at *2, *5, *8-9; SSR 96-8p, 61 FR 34474-01, at *34478.  The ALJ

provided sufficiently clear reasons for rejecting Taylor's depression subjective symptom

complaints when he stated that her treatment notes showed that she was euthymic, alert, oriented,

cooperative, and managed her symptoms well on medication, and that her activities of daily

living were consistent with an RFC to perform light work.  (Tr. 22); *Felisky*, 35 F.3d at 1036.

And the ALJ's reasoning tracked five of the relevant factors, including Taylor's daily activities,

the duration and intensity of her symptoms, the effectiveness of her mediation treatment, and any

measures she used to relieve her symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see*

*Temples*, 515 F. App'x at 462.  Thus, the ALJ applied proper legal standards in evaluating

Taylor's subjective symptom complaints.

Substantial evidence also supports the ALJ's conclusions regarding Taylor's subjective

symptom complaints and RFC.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  At bottom,

Taylor's contention is that the ALJ should have found that she would be absent from work often

enough for her absenteeism to be work preclusive.  ECF Doc. 14 at 10-11.  But substantial

evidence supported the ALJ's implicit determination that her statements that her depression and

mood swings caused to her self-isolate in bed for up to three days per month were inconsistent

with the evidence.  (Tr. 22).  Such evidence includes: (1) mental status exams from Harbor

Behavioral Healthcare from May 24, 2017 through October 17, 2018, repeatedly showing

euthymic mood, broad affect, logical thought process and memory, and that Taylor was alert and

oriented; (2) mental status exams from Zepf Center from November 10, 2017 through March 6,

2019, showing no agitation, anhedonia, euphoria, flight of ideas, hopelessness, mood swings, or

increased activity and noting good orientation and normal judgment and attention span and

concentration; (3) Taylor's statements to providers from June 5, 2018 through January 30, 2019

that she had "good mood," "alright" motivation, was "pretty good," had "alright" energy levels, and was "stable"; (4) Taylor's statements to Dr. Zick on October 17, 2017 that she was maintaining a schedule of hockey activities with her kids six days per week; (5) treatment notes from providers whose impression was that Taylor was "fairly stable" and "stable overall;" (6) Taylor's statements in her function report that she could independently manage personal care, household chores, shopping, managing money, socialize, and attend daily drug treatment; (7) Taylor's testimony that she missed doctors' appointments because she had forgotten about them, as opposed to missing them as a consequence of her depression symptoms; and (8) Dr. Zeune's and Dr. Foulk's opinions that Taylor had no significant limitations in her ability perform activities within a schedule, maintain regular attendance, be punctual, and sustain an ordinary routine.  (Tr. 49, 63, 66-67, 117-18, 136-37, 324-30, 1617, 1619, 1847-48, 1853, 1855-57, 1868-69, 2027, 2031-32, 2039-40, 2070-71, 2073-74, 2096, 2099-2101, 2107-18, 2104-05, 2109, 2213, 2216-17, 2242-43, 2253, 2258-59, 2264, 2269, 2275, 2281, 2287, 2293, 2298, 2303, 2308, 2314, 2317, 2320, 2324).  The same evidence supported the ALJ's ultimate RFC finding.  (Tr. 22).  Even if other evidence in the record or even a preponderance of the evidence in the record could have supported a different conclusion, this court cannot overturn the ALJ's decision because substantial evidence supported the ALJ's RFC determination.  *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

Because the ALJ applied proper legal standards and his conclusions were reasonably drawn from the record, the ALJ's evaluation of Taylor's subjective symptom complaints and ultimate RFC assessment fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.  Accordingly, I recommend that the ALJ's subjective complaint analysis, RFC analysis, and decision denying Taylor's applications for DIB and SSI be affirmed.

## V.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Taylor's applications for DIB and SSI be affirmed.

Dated: June 11, 2021

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).